H. Anthony JAMES, Plaintiff,

v.

Anthony M. FRANK, Postmaster General of the United States Postal Service, Defendant.

Civ. A. No. C–1–85–1820.

United States District Court, S.D. Ohio, W.D.

Feb. 6, 1991.

On Attorney's Fees and Costs Aug. 13, 1991.

Robert F. Laufman, Trial Atty., Cincinnati, Ohio, for plaintiff.

D. Michael Crites, U.S. Atty., Donetta D. Wiethe, Asst. United States Atty., S.D. Ohio, Cincinnati, Ohio, Suzanne H. Milton, Atty., Office of Labor Law, Washington, D.C., for defendant.

## MEMORANDUM OPINION AND ORDER

NATHANIEL R. JONES, Circuit Judge.*

This matter came before the court for trial on May 7, 1990, and was concluded on May 15, 1990. Many of the factual questions in the instant action were brought into sharp focus by the testimony of numerous witnesses and the submissions of documentary evidence detailing the plaintiff's allegations and the defendant's rebuttals thereto. The court, having considered

* The Honorable Nathaniel R. Jones, United States Court of Appeals for the Sixth Circuit, sitting by designation.

the aforementioned evidence and legal arguments of the parties, enters the following Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52(a).

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

## I. INTRODUCTION

Plaintiff H. Anthony James is a 60% disabled veteran whose right leg was amputated above the knee after he stepped on a land mine in Vietnam. He wears a prosthesis which allows him to engage in many activities such as walking, climbing ladders, playing racquetball, and yard work. Because of stump problems secondary to pressure from his prosthesis, plaintiff is limited to the length of time he can stand or walk. In 1976 James received a career appointment to the Postal Service and during his tenure at the Postal Service has held several different positions.

In this civil rights action, plaintiff seeks to recover against the Postal Service for failure to make reasonable accommodations, retaliation,[1] and handicap discrimination from 1983 until the present. The jurisdiction of the court, which is disputed, is invoked under 29 U.S.C. § 794(a)(1), 42 U.S.C. § 2000e–5(f) and § 2000e–16(c), and 5 U.S.C. § 7703.

## II. JURISDICTION

As a preliminary matter, the court will first address the Postal Service's jurisdictional challenge. The Postal Service argues that plaintiff's claims for failure to accommodate from 1983 to 1988 are not properly before this court because the appropriate administrative process has not been exhausted.

Equal employment in the federal government, including the United States Postal Service, is governed by 29 C.F.R. § 1613. An aggrieved person must bring the matter to the Equal Employment Opportunity ("EEO") counselor within thirty calendar days of the alleged discriminatory event and must file a written complaint within fifteen days after receipt of the notice of the right to file a complaint. 29 C.F.R. § 1613.214(a). A federal employee is authorized to file a civil action in the federal district courts if there has not been a final decision by the agency within 180 calendar days from the date of the filing of the written complaint. 29 C.F.R. § 1613.-281(b).

First, the court examines James' claims for failure to accommodate from November 12, 1985 to March 20, 1986. James' claims during this period include both the denial of a chair and the providing of a chair but no work. Concerning these claims, James asserts that he contacted his EEO counselor on December 24, 1985, January 14, 1986, and March 14, 1986. The Postal Service does not contest these assertions. On March 24, 1986, James received his notice of right to file a complaint. He filed a written complaint on April 2, 1986, within fifteen calendar days of receipt of the notice of right to file a complaint. The question is whether James contacted his EEO counselor within thirty calendar days of the alleged discriminatory event.

■ With respect to the Postal Service's failure to provide James with a chair, the Postal Service asserts that James was required to contact his counselor on or before December 12, 1985, thirty days from the date the alleged discriminatory acts began, to preserve his cause of action. Because the discriminatory acts continued after November 12, 1985, however, James' failure to contact his counselor within the first thirty days does not render his complaint untimely. Alleged discriminatory acts occurred on November 24, 1985, thirty days prior to the date on which James first contacted his counselor. Therefore, the court finds that with respect to the claims based on the failure to provide a chair,

---

1. Although plaintiff alleges a claim of retaliation in conjunction with his claims for failure to accommodate and discrimination, no evidence was presented at trial which would support a retaliation claim independent of James' claims of failure to accommodate and discriminatory failure to promote. Therefore, the court only makes findings of fact and conclusions of law with respect to plaintiff's accommodation and promotion claims.

James complied with the administrative regulations. *See DiMaggio v. United States Postal Service*, 643 F.Supp. 1, 6 (D.Conn.1984) (handicap claim exhausted if one brings claims before counselor within thirty days of event and files complaint within fifteen days of final interview with counselor).

The Postal Service allegedly began providing James with a chair but no work in December 1985. As noted above, James contacted his EEO counselor on December 24, 1985, and January 14, 1986. Thus, the court finds that he complied with the thirty day requirement.

■ The question then becomes whether James was authorized to file a complaint in the district court on November 26, 1985. No final action was taken on James' EEO complaint. James' EEO complaint was filed on April 2, 1986. Under 29 C.F.R. § 1613.281(b), James was authorized to file suit in federal district court "[a]fter one hundred and eighty (180) calendar days from the date of filing a complaint with the agency if there has been no decision." Thus, his original complaint was filed prior to the time of authorization. However, plaintiff filed a second amended complaint on March 2, 1987. More than 180 days had elapsed by this time.

The court concludes that the 180-day requirement in 29 C.F.R. § 1613.281(b) is better viewed as a condition precedent rather than as a jurisdictional prerequisite. *Cf. Pinkard v. Pullman–Standard*, 678 F.2d 1211, 1215 (5th Cir. Unit B 1982), *cert. denied*, 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 954 (1983) (holding that the receipt of a right-to-sue letter in a Title VII claim is a condition precedent rather than a jurisdictional prerequisite); *see also Puckett v. Tennessee Eastman Co.*, 889 F.2d 1481, 1488 (6th Cir.1989) (leaves open the question of whether a right-to-sue letter is a jurisdictional prerequisite or a condition precedent). In this case, plaintiff filed his complaint in district court before the 180-day requirement had passed. However, plaintiff filed a second amended complaint after expiration of the 180-day period and before dismissal. Plaintiff's second amend-

ed complaint cured his initial failure to satisfy the condition precedent. Therefore, the court finds that James' failure-to-accommodate claims for the period of November 12, 1985 to March 20, 1986, are properly before this court.

Second, the court examines James' failure-to-accommodate claims arising out of events occurring prior to November 12, 1985 and after March 20, 1986. Defendant has contended since this action began, both in pre-trial and post-trial briefs, that the court has no jurisdiction over claims occurring between two periods: (1) between 1983 and November 12, 1985; and (2) between March 20, 1986 and 1988. The Postal Service argues that James failed to exhaust his administrative remedies with respect to these claims. James, however, in response contends that the court has jurisdiction over these claims because from 1983 to 1990 there has been a continuous failure to accommodate.

■ Generally, when a discriminatory act is not made the basis of a timely charge, it is "merely an unfortunate event in history which has no present legal consequences." *United Airlines v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977). "This result, however, does not obtain where subsequent identifiable acts of discrimination occur within the critical time period and are related to the time-barred incident." *Held v. Gulf Oil Co.*, 684 F.2d 427, 430 (6th Cir.1982). This concept, which is most often applied in Title VII cases, has become known as the "continuing violations" theory. "[A] plaintiff seeking to establish a continuing violation must show 'a series of related acts, one or more of which falls within the limitations period, or the maintenance of a discriminatory system both before and during the limitations period.'" *McKenzie v. Sawyer*, 684 F.2d 62, 72 (D.C.Cir.1982) (citation omitted). Thus, although a lawsuit based on a single discriminatory act for which a plaintiff failed to exhaust his administrative remedies may be barred, lawsuits based on acts of a continuing nature are not barred for failure to exhaust administrative remedies, as long as the plaintiff

exhausts his administrative remedies while the violation is continuing. *Id.* Further,

> Plaintiffs may not utilize the continuing violation theory to resurrect claims about discrimination concluded in the past, even though its effects persist. Once having shown discrimination continuing into the actionable period, however, the plaintiffs may also recover for portions of the persistent process of illegal discrimination that antedated the limitations period.

*Id.* (citations omitted).[2]

With these legal principles in mind, the court concludes that the alleged failure-to-accommodate violations in the present case began in 1983 and continued well into 1989, if not thereafter. James exhausted his administrative remedies with respect to the continuing violations occurring between November 12, 1985, and March 20, 1986. Therefore, the continuing violations theory applies in this case and the alleged failure-to-accommodate acts occurring prior to November 1985 and after March 1986 are not rendered legally insignificant.[3]

## III. REASONABLE ACCOMMODATION AND RETALIATION

### A. APPLICABLE LAW

The Rehabilitation Act, 29 U.S.C. § 791(b), imposes an affirmative duty on the Postal Service to accommodate otherwise qualified handicapped individuals. The applicable federal regulation, 29 C.F.R. 1613.703, states that "Agencies should give full consideration to the hiring, placement, and advancement of qualified ... handicapped persons. The Federal Government shall become a model employer of handicapped individuals." Under 29 C.F.R. § 1613.704, federal agencies are required to make reasonable accommodation:

> (a) An agency shall make reasonable accommodation to the known physical or mental limitations of a qualified handicapped applicant or employee unless the agency can demonstrate that the accommodation would impose an undue hardship on the operation of its program.
>
> (b) Reasonable Accommodation may include, but shall not be limited to: (1) Making facilities readily accessible to and usable by handicapped persons, and (2) job restructuring, part-time or modified work schedules, acquisition or modification of equipment or devices,....

In order to make out a claim for discrimination based upon an employer's failure to accommodate, the employee must present evidence that he or she is "otherwise qualified" for the position or that he or she would be able to perform "the essential functions" of the job with "reasonable accommodation."

> "[A]n otherwise qualified person is one who can perform 'the essential functions' of the job in question. When a handicapped person is not able to perform the essential functions of the job, the court *must also consider* whether any *'reasonable accommodation' by the employer would enable* the handicapped person to perform those functions."

*Hall v. U.S. Postal Service*, 857 F.2d 1073, 1078 (6th Cir.1988) (emphasis in original) (citation omitted). Once the handicapped person demonstrates qualifications, "[t]he burden is on the *employer* to present credible evidence that a reasonable accommodation is not possible in a particular situa-

---

**2.** In addition, even absent a continuing violation, an earlier act of discrimination not timely charged "'may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue.'" *McKenzie*, 684 F.2d at 72 (quoting *United Airlines, Inc. v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977)).

**3.** In addition to its exhaustion argument, the Postal Service contends that James' failure to accommodate claims from 1983 to 1988 are "moot" as a result of a decision rendered by the Merit Systems Protection Board ("MSPB"). The court has carefully considered this "mootness" argument but finds it to be without merit. The issue before the MSPB was whether James and others were unlawfully furloughed by the Postal Service. The MSPB granted no remedy for any failure to accommodate by the Postal Service. The court simply refuses to construe James' appeal to the MSPB as fairly challenging several years of a continuing failure to accommodate by the Postal Service. Other jurisdictional issues raised by the Postal Service were unsupported and therefore without merit.

tion." *Id.* at 1080 (emphasis in original). "In determining whether a handicapped individual can perform the essential functions of a position, and, if not, whether a reasonable accommodation will enable him or her to do so, a district court 'will conduct an *individualized inquiry* and make appropriate findings of fact.'" *Id.* at 1078–79 (emphasis in original) (citation omitted).

## B. POSTAL SERVICE'S ACCOMMODATION OF JAMES

As discussed above in the court's discussion of James' continuing violation theory in this case, the court will consider James' claims from 1983 until the present. The court will discuss the Postal Service's alleged failure to accommodate in segments correlating to different jobs which James had within the Postal Service.

### 1. *Light Duty Work at Main Post Office*

From November 1983 until March 1986, James worked at the Main Post Office in Cincinnati, Ohio. From November 1983 until August 8, 1985, James worked in the light duty unit. Light duty assignments, covered by Article 13 of the National Agreement between the Postal Service and its unions, are provided at the management's discretion, depending upon the needs of the Postal Service.[4]

On April 20, 1983, plaintiff bid on and received a lower level five distribution clerk position in the Cincinnati Fountain Square Station, a truck terminal. The position required walking for extending periods of time and unloading trucks, both of which caused James' problems. Although James informed his supervisor of his inability to handle this type of assignment, he was told that no accommodation was possible because the position required the extended walking and the unloading. James' medical evaluation indicated that he could not handle these job duties.

On May 10, 1983, plaintiff requested a permanent light duty assignment, but continued to work in the station until a light

duty position was available. In November 1983, plaintiff was transferred from the truck terminal to permanent light duty in the Main Post Office. Initially, James sorted mail; however, after several months, he became the mailgram technician and continued in this capacity until August 1985.

On August 8, 1985, Charles Caton, the Cincinnati Postmaster, informed James that his light duty assignment was cancelled. From August 13, 1985 to November 12, 1985, James remained in a nonpay, nonduty status with the Postal Service. This layoff was the subject of the aforementioned MSPB action.

On November 12, 1985, James was recalled to work as a distribution clerk performing light duty. When he returned to work, James discovered that employees who had been injured on the job (limited duty) were permitted to sort mail while seated in a straight back chair. James was required to sort mail while standing and was sent home without pay when he could no longer stand. He requested a straight back chair, but his request was denied. For approximately three weeks, James was sent home when it became too painful to stand. Then, in early December, James was told to sit in a straight-back chair in an open area with no work to do. In January 1986, a supervisor asked him to separate rubber bands according to size and "beauty."

Also in January, James was moved to a wooden bench in the same area for one week. During this time, he did no work. On one occasion, James sat in a straight-back chair while one of the limited duty employees was at lunch. Rita King, his supervisor, ordered him to move. After James refused, explaining that it was painful to sit on the bench, King returned with four guards, who escorted plaintiff out of the building. The next day, James returned to work and was provided with a straight-back chair and allowed to work casing third-class mail.

---

**4.** Light duty is distinguished from "limited duty," which covers employees injured on-the-job. The Federal Employees Compensation Act (FECA) requires an employer to compensate employees injured on the job, regardless of their ability to work. The differences between light duty and limited duty, and the rationality of this distinction, are not directly before this court.

■ The court finds that the Postal Service did not unreasonably fail to accommodate James prior to August 1985. To be sure, from 1983 to August 1985, there were problems accommodating James; however, the evidence shows that the Postal Service did eventually accommodate plaintiff's situation in some acceptable manner and within a reasonable period of time. On the other hand, the court finds that subsequent to August 1985, the Postal Service failed to make timely, reasonable accommodations, specifically James was not allowed to sort mail in a straight-back chair. Although the Postal Service eventually provided James with such work, the harassment he suffered at the hands of his supervisors, especially Rita King, is indefensible under the Rehabilitation Act.

## 2. *General Expediter Position*

In March 1986, James became a general expediter. The extent to which his lawsuit was a catalyst for obtaining this position is discussed at another point of the opinion. Margaret Willis testified that when she began work as a general expediter in 1984, all of the expediters had chairs. However, one week before James came, all of the chairs were removed. One week later, the expediters in the North and West Docks received chairs, but the Incoming and Outgoing Docks, where James and Willis worked, did not get chairs until three weeks later.

After James did get a chair, it would disappear when he was not present, and he would have to search for it. A chain James bought to secure the chair was cut and the chair removed. On one occasion, James found his chair on a truck on the way to New Jersey. This activity went on for several weeks. Jenny Girman, a supervisor at the dock, testified that she recalled its disappearance. However, there is no indication that management or the supervisors had anything to do with the missing chair.

Also, James testified that as a general expediter, he was required to do the "lot list" three or four days each week. The lot list entailed walking all around the lot and writing down the license plate numbers of the trailers. Of all of the tasks of the general expediter, it was the job which required the most walking. Girman and Joseph Haney, both former supervisors while James was a general expediter, testified that while James did not prepare the lot list very often, he frequently was assigned the task of filling out the lot list.

■ Upon review of the evidence, the court finds that the Postal Service's accommodation of James during the period in which he was a general expediter was not reasonable. In particular, the court finds the testimony of James, supported by Willis, that he was required to do the lot list frequently to be more credible than the testimony of Haney and Girman. It was certainly not a reasonable accommodation to frequently require the handicapped general expediter to perform the work which involved the most walking. With respect to the missing chair, there is no evidence that management was responsible for its daily disappearance, but the Postal Service took no efforts to insure that the chair would stay put. Nevertheless, the court is unable to find a failure to accommodate on the basis of the missing chair.

## 3. *Window Markup Clerk*

In May 1987, James was the successful bidder on the Window Markup Clerk Position at the Main Post Office. He took this position, even though it was a downgrade to a level five position, because he was looking for easier physical responsibilities and because it was a prerequisite to the Window Service Technician T-6 position. When he first arrived, James was provided a stationary straight-backed chair. However, this chair proved to be unworkable because he could not gain access to the drawers in his area. In order to gain access to the drawers in his cage, it was necessary for James to get up from his chair, stand up, move the chair, open the drawer, return the chair, and sit down. In April 1988, the Veterans Administration ("V.A.") Hospital wrote a note asking the Postal Service to provide James with a suitable chair.

On May 2, 1988, the V.A. recommended a high chair with arms and wheels. James had previously requested such a chair verbally to his supervisors. According to his testimony, in May 1988, James for the first time wrote his supervisor, Gwen Mendenhal, with this request. Mendenhal informed James that the chair might be a "safety hazard" and told him that she would have to talk to Kathy Gill. In June and July 1988, Dr. Jonsyn, the Postal Service Medical Officer, reported that James would require a chair with wheels to give him mobility while sitting. Finally, in August such a chair was ordered. A chair was delivered in the fall without arms and was returned. The correct chair arrived in December 1988. The Postal Service notes that several accommodations were made during this time, including the relocation of James' cash drawer slot and the allowance of different treatment for Express Mail.

▪ The court finds that the amount of time it took for James to receive the proper chair is not justifiable. Providing a chair with arms and wheels is not an undue burden on the Postal Service. While a certain amount of bureaucratic delay can be excused, seven months passed before James received the chair that he initially requested. During the interim period, James left work on at least six occasions, according to Mendenhal, and took sick leave due to pain in his leg. In light of James' inability to work effectively with only a straight-back chair, the Postal Service was obligated to provide him a chair with arms and wheels within a reasonable time. The court finds that the amount of time taken was not reasonable.

#### 4. *Window Service Technician*

In March 1989, James bid on the Window Service Technician (T–6) job at the Sycamore Branch, but was not listed as a successful bidder. However, after James complained, the Postal Service agreed to list him as the senior bidder. Upon James learning the procedures for the Sycamore Post Office Branch, he could be assigned to Sycamore. James requested permission to move his chair from the Main Post Office to Sycamore and was allowed to do so.

At Sycamore, James was again an employee under the indirect supervision of Greg Engel, a Postal Service supervisor with whom James had differences in 1983 in Fountain Square. James' arrival at Sycamore was delayed for two months while he obtained an SF–46 government driver's license. Engel told James the license was a requirement for his job, but James later learned that other T–6's did not have such a license. Since James' special chair was at the window, Engel told James that he would get him a chair and desk for his paperwork. In the meantime, James used other clerks' chairs and desks while they were at lunch or on break.

▪ When Engel received a detail at another Post Office in September 1989, James had no problems with Engel's temporary replacement, Paul Strong. During that three month period, James would cover the windows for two to three hours a day, during other employees' lunch hours. When Engel returned, according to James, Engel told him that the Post Office required him to be on windows six to eight hours per day. Engel testified that he asked James to work more than two to three hours a day at the window only at Christmas time, when the volume was heavy. James then called for an EEO counselor. After some delay, Thomas Lang, who was the manager of labor relations, and Mike Brown, from the EEO, visited James at the Sycamore Branch. After meeting with James and Engel, the problem was resolved. James did not file a EEO claim, and Engel agreed not to require James to spend more than two to three hours per day at the window.

It is clear from the evidence that the efforts of the EEO were required to resolve the situation at Sycamore. Although independently such an occurrence might not be considered a violation of the Rehabilitation Act, James' history of a lack of accommodation and Engel's personal familiarity with James leads this court to conclude that the Postal Service did not reasonably accommodate James at Sycamore.

## IV. DENIAL OF PROMOTIONS

### A. APPLICABLE LAW

The law governing claims filed under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, is applicable to James' contention that he was denied promotion to various positions within the Postal Service due to his handicap. James must establish a *prima facie* case that he was denied promotion for an impermissible reason. "[A] prima facie case is ordinarily established by proof that the employer, after having rejected the plaintiff's application for a job or promotion, continued to seek applicants with qualifications similar to the plaintiff's." *Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 108 S.Ct. 2777, 2784, 101 L.Ed.2d 827 (1988). The defendant must then articulate a legitimate, nondiscriminatory reason for the denial. If the defendant successfully does so, the plaintiff must show by a preponderance of the evidence that the defendant's stated reason is a pretext. *Id.*

### B. POSTAL SERVICE'S ACTIONS REGARDING PROMOTIONS

#### 1. *EAS–13 Supervisor*

 James applied for the position of Supervisor, Station/Branch, EAS–13 ("EAS–13 position") in February 1983. The EAS–13 position involved direct supervision of letter carriers. Selection for the position was based on written application rather than applicants' PASS ratings. Loretta Ladd, a manager of delivery programs for the Postal Service, served as chairperson of the selection and review panel that evaluated candidates for the five to six EAS–13 vacancies in 1983. The panel consisted of two other members. Ladd testified that competition for the EAS–13 positions was considerable because these positions are the first level of supervisory position to which "craft" personnel such as James aspired. Ladd did not know of James at the time his application was screened by the panel. However, James' application did note that he was a disabled veteran.

Even imputing knowledge of James' disability to the selection committee, the court is unable to find that James was denied promotion to the EAS–13 position because of his handicap. Unlike the question of qualifications regarding the PS–6 position discussed below, the qualifications of the applicants chosen to fill the EAS–13 position were superior to James'. All candidates making the final cut had experience as acting supervisor. James did not. Moreover, James' work experience was limited to mail processing at the general mail facility. The EAS–13 position required a command of station or branch work (i.e., selling postal products and mail delivery). While Ladd testified that a worker with station experience is not automatically presumed to be better qualified for an EAS–13 position than one without such experience, she indicated that station experience is looked upon favorably and enhances a candidate's overall rating.

On the evaluation completed by his supervisor and submitted to the selection panel for consideration, James received an "excellent" in the following categories: 1) knowledge of the work to be supervised; 2) effective communication; 3) decision making; 4) achievement and drive; and 5) human relations. James received no rating in a sixth category, planning and scheduling, because he had not been observed with respect to these skills. Each of the six candidates ultimately selected for the EAS–13 positions had a combination of "excellent" and "good," the second highest rating, on their Form 991 supervisors evaluations.

Although James posted straight "excellents," his overall qualifications did not exceed those of the candidates ultimately selected. The check-list ratings were close. Finalists Gregory C. Karbowski received "excellent" in all categories except "effective communication," for which he received a "good." Finalist James J. Christopfel received three "excellents" and three "goods." Finalist Gregory P. Engel received five "excellents" and one "good." Finalist Ronald E. Maifeld received all "goods." Finalist Thompson received three "excellents" and three "goods." And finalist Coleman received three "excel-

**994**

lents" and three "goods." James presented no evidence that the check-list ratings were the primary criteria used by the selection panel, and Ladd's testimony regarding the importance of station experience was uncontradicted.

The evidence shows that the panel chose from a highly qualified group of candidates, with those having station experience being given an edge. Unlike the PS–6 position, there is no evidence that other EAS–13 candidates were rated above James due to his handicap or that individual members of the selection panel had a negative perception of James because of his handicap.

James complains that he was denied details and acting supervisory assignments which would have made him more competitive with EAS–13 candidates who had station experience. Although James noted the denial of details and 204–B assignments in his EEO discrimination complaint based on nonselection for the EAS–13 position, (See Plaintiff's Exhibit 107 at p. 179) he presented scant evidence at trial that his denial of details and 204–B assignment were due to his handicap. In short, even assuming that James has administratively exhausted claims based on denial of details, these alleged denials cannot provide the bases for finding handicap discrimination against James in the EAS–13 selection process. The thrust of James' evidence was that he was better qualified than many of the EAS–13 candidates finally selected, not that he was impermissibly denied details which would have augmented his chances of actually being selected.

However, to the extent that James has attempted to show the latter, his evidence is insufficient. More is required than general allegations that James requested but was denied details while some employees received such details. The court cannot infer handicap discrimination from this paucity of evidence. Therefore, the court finds that the Postal Service did not deny James a promotion to the EAS–13 position based on his disability.

### 2. *PS–6 Training Technician*

#### i. Job Denial Discrimination

On December 11, 1986, James applied for the position of Training Technician PS–6.

James was interviewed by Myrtle Nelson, the Supervisor of Training. James testified that the interview lasted for ten to fifteen minutes. Nelson testified that it lasted thirty minutes because of James' complaints. At her deposition, however, Nelson stated that the interview was between ten and twenty minutes. Nelson testified that James felt management discriminated against him, and that with his attitude, he would not be effective in his job. James testified that the only discussions of his handicap came in response to a question about his crutches, which were the result of a then-recent surgery. James also testified that Nelson inquired whether he could get in and out of cars.

Of the twenty candidates for the three PS–6 positions, Nelson selected three individuals for the job. In his claim, James alleges that Diane Maines, one of those selected for the PS–6 position, was not as qualified as he. Nelson testified that she chose Maines because of her work with computers and her excellent evaluations from supervisors. The records reveal that Maines received higher ratings from Nelson than James. However, the basis for Nelson's markings are at issue.

Essentially, this issue comes down to a credibility determination between the testimony of Nelson and that of James. The court finds Nelson's testimony concerning her reasons for rejecting James to be less credible. The requirements for the job included instructing craft employees, acting as a classroom instructor, and training employees to drive trucks. Nelson testified that she selected Maines over James on the basis of their the applications, absenteeism, and the interviews. The PS–6 job did not depend upon the PASS system. First, with respect to the 991 forms, it is obvious that James was better qualified on paper in many categories: **Education**—James had an associate degree in secondary education from the University of Cincinnati; Maines had a course in typing. Nelson conceded in cross-examination that James had vastly superior educational qualifications; **Training**—James had supervisor training, and

Maines had flat sorting training. Nelson conceded in cross-examination that James had superior training; **Positions Held**— James had nine years in the Postal Service, including work as a general expeditor and experience as a credit manager for Westinghouse Credit Corp., a machine operator for General Electric, and a Combat Engineer for the United States Army. Maines had only two years in the Postal Service, and two previous secretarial positions. Nelson testified that she did not know whether James had had a wider range of responsibilities in other jobs with the Postal Service. Nelson did consider it of value that James had experience driving two-ton trucks while in Vietnam. In sum, despite Nelson's pleading of uncertainty on the record, it is clear to the court that James' 991 form was more qualified than Maines' for the position.

The next area of inquiry is the qualifications ratings given by Nelson in eleven categories. The ratings ranged from 0 to 4, with the degree to which element is demonstrated as follows: 0 = not demonstrated; 1 = low; 2 = potential; 3 = satisfactory; and 4 = superior. The individual ratings are as follows:

**Category One—Ability to Work without Immediate Supervision**—James was given a 2 while Maines was given a 4. Even though James was working effectively without supervision at the time of the interview, Nelson gave a higher rating to Maines because she was detailed to the PS-6 job at the time of the interview.

**Category Two—Ability to Use Reference Materials and Manuals**—James received a 3 and Maines received a 4. Maines' higher score, according to Nelson, was because Maines was using the appropriate reference manuals already as a part of her detail.

**Category Three—Ability to Maintain Records and Prepare Reports**—James received a 3 and Maines received a 4. Nelson testified that James' score was lower than Maines' because some of James' positions go back a long way, while Maines was already on the job.

**Category Four—Ability to Perform Effectively Under Pressure**—James received a 0 and Maines received a 4. Nelson gave James such a low rating because she viewed his complaints about his handicap and his discussion of his surgery during the interview as unprofessional.

**Category Five—Ability to Interpret Instructions**—James received a 2 and Maines received a 3. The reason for Maines' higher score, according to Nelson, was that she was already doing the job under the detail.

**Category Six—Ability to Instruct**—James received a 4 and Maines received a 3. James received a higher score because of his significant prior experience in training.

**Category Seven—Knowledge of Relevant Lines of Work**—James received a 2 and Maines received a 4. The basis for Maines' higher rating was again the fact that she was already doing the job.

**Category Eight—Ability to Operate Office Machines**—James received a 0 and Maines received a 4. Nelson testified that James received a 0 because he had no previous experience with computers; he only said he could learn. James testified that he owned an IBM-compatible computer but not the type at the Postal Service—Apple. He stated to Nelson that he could learn how to use an Apple. In the court's view, Nelson failed to understand the distinction between knowledge of computers in general and knowledge of a particular type of computer.

**Category Nine—Ability to Understand and Comply with Instructions**—James received a 3 and Maines received a 3.

**Category Ten—Ability to Analyze, Explain and Apply Arguments**—James received a 2 and Maines received a 4. Nelson explained that James' experiences demonstrating such an ability were not recent.

**Category Eleven—Ability to Work with Others**—James received a 3 and Maines received a 4. The basis of the difference, according to Nelson, was Maines' excellent job in the office during the detail, as contrasted with what Nelson felt was James' attitude problem.

Finally, Nelson testified that she rated James lower because of his attendance record. However, she admitted that she did not realize that the extended absence was due to surgery and that the one-day absences may have been caused by excessive standing.

■ Overall, it is clear that with respect to the ratings of James and Maines, Nelson rated Maines superior for two major reasons: James' alleged anti-management bias and Maines' current performance on the detail. With respect to James' "attitude problem," the court finds that Nelson improperly took his handicap into account. The differences in her testimony from the deposition to the trial and her demeanor lead the court to conclude that Nelson, for whatever reason, took James' proper discussion of the relevant aspects of his handicap as an indication of an "attitude problem." With respect to Maines' detail, the court notes that James' assertions of discrimination against him through his inability to obtain a detail are not directly at issue in this case since there has been no EEO report on such an accusation. However, it is also clear that Maines was rated higher in Ability categories because of her detail. James' lack of detail work should not affect the supervisor's determination of his "ability." However, in the instant case, that is exactly what happened. As such, the court finds that the Postal Service discriminated against James by denying him the position of PS–6 Training Technician.

### ii. Mitigation

■ The final issue with respect to the PS–6 position is the Postal Service's contention that James failed to mitigate the damages because he refused to accept a job as a Data Collection Technician in February 1987. Remedies under Title VII, and accordingly, the Rehabilitation Act, are subject to the reasonable mitigation by the plaintiff of damages incurred. *Ford v. Nicks,* 866 F.2d 865, 873 (6th Cir.1989). "[T]he employer has the burden of demonstrating that there were substantially equivalent positions available with 'virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status.' " *Id.* (citation omitted). "An employee is not required to go to heroic lengths in attempting to mitigate his damages, but only to take reasonable steps to do so." *Id.*

Tom Doddridge, a Postal Service supervisor, informed James of the existence of this position because it was his understanding that James would have priority consideration due to his EEO complaint. Doddridge testified that he notified James about this particular job because it was mostly sedentary, with some walking. James testified that after his discussion with Doddridge, he discussed the position with some of the Data Collection Technicians.

James decided not to apply because the job was a night job, and the night job's requirements differed from that of the day job. Specifically, the job notice stated that if the employee was not needed at Data Collection, he or she would have to go to the primary lines. His discussions with then-current employees confirmed that there was some work at the primary lines which was physical in nature. Upon review of the testimony, the court finds that James did not fail to mitigate his damages. His decision not to apply for the Data Collection Technician Job was a reasonable one. The additional physical labor, night hours and variable duties of the Data Collection Technician position render it not "substantially equivalent" to the PS–6 position.

## V. ATTORNEY'S FEES FOR OBTAINING GENERAL EXPEDITOR POSITION

■ In January 1986, after he had filed his original complaint in this action, James was senior bidder for the position of General Expediter. James was denied this position in February 1986, allegedly due to his handicap. In his first amended complaint, James included his failure to receive this position and advised the Postal Service that a motion for temporary restraining order had been prepared with respect to the denial of the General Expediter position. In March 1986, he was awarded the position.

James contends that he was awarded the General Expediter position because of the amended complaint and the notice of a temporary restraining order. Therefore, James asserts that he is entitled to attorney's fees as a prevailing party.

The Postal Service, however, argues that although James was denied the General Expediter position in February 1986, he was not later given the position because of the addition of this denial in his amended complaint or because of the threatened temporary restraining order. The Postal Service claims that James was given the position because a later fitness examination for duty revealed that he was able to perform the job. The court notes that the Postal Service also consulted with plaintiff and his attorney before awarding him the position.

The court finds that James is entitled to attorney's fees as a prevailing party with respect to the General Expediter position. Although the Postal Service claims that it offered James this position of its "own free will," absent any influence by his legal actions, the events surrounding the denial and the later grant of the position, indicate that his amended complaint and threatened legal action influenced, in no small degree, the Postal Service's actions. In *Othen v. Ann Arbor School Board*, 699 F.2d 309, 313 (6th Cir.1983), the Sixth Circuit Court of Appeals stated that, for the purposes of awarding attorney's fees, it is not necessary for a party to secure a judgment in his favor in order to be a prevailing party. The court stated that:

> If a party achieves a substantial portion of the relief sought or succeeds on a significant issue as the result of an agreed settlement or a consent decree this is sufficient to support an award of attorney's fees. A plaintiff may also qualify as the prevailing party if his lawsuit is found to be the 'catalyst' which causes the defendant to make significant changes in its past practices, though no direct relief is obtained.

*Id.* at 313 (citations omitted). The court finds that James' amended complaint and his threat of a temporary restraining order was the "catalyst" which caused the Postal Service to give him the General Expediter position. As such, James is a prevailing party with respect to his obtaining that position.

## VI. CONCLUSIONS

In light of the above findings of fact and conclusions of law, this court hereby orders the following relief.

This court finds that James is entitled to back pay and retroactive promotion to the position of PS–6 Training Technician due to the Postal Service's refusal to promote James to the PS–6 Training position because of his handicap. James is also entitled to back pay for those days he was sent home without pay in November 1985 due to his inability to continue standing on his prosthesis, as James' inability to continue working was a result of the Postal Service's failure to accommodate James by providing him with a straight-backed chair. The court also recognizes that back pay damages may be appropriate for the period of James' unlawful furlough from August 8 to November 12, 1985, if James was not fully compensated for that period under the MSPB decision. As the parties have stipulated, we order the parties to attempt to resolve the amount of back pay due in light of the court's findings. If agreement cannot be reached, the plaintiff shall request a hearing on the issue of back pay.

As this court finds that the Postal Service has engaged in an inexcusable practice of consistently failing to accommodate James' handicap from 1985 until 1990, injunctive relief is appropriate. *Wagner v. Taylor*, 836 F.2d 566 (D.C.Cir.1987). The court orders the Postal Service to provide reasonable accommodation for James' handicap as required by law in his current position and all future positions, to provide an appropriate chair or other such accommodation as James may need to satisfactorily accomplish the tasks of his work, and to consider James for all promotions for which he applies and is qualified with reasonable accommodation without regard to his handicap. This court further orders that the Postal Service not retaliate against James for any prior complaints, this com-

plaint or any future complaints against the Service in which he seeks to protect his right to work free of discrimination on the basis of his handicap. In addition, this court orders the parties to attempt to resolve the amount of any compensatory damages available on behalf of James in light of this court's findings with respect to the Postal Service's failure to accommodate James.

Plaintiff shall submit his request for attorney's fees along with supporting memoranda within thirty days.

## ON ATTORNEY'S FEES AND COSTS

On February 6, 1991, this court issued an opinion and order in this case. Among other things, the court awarded plaintiff H. Anthony James with back pay damages. Concerning the various back pay awards, the court stated that "As the parties have stipulated, we order the parties to attempt to resolve the amount of back pay due in light of the court's findings. If agreement cannot be reached, the plaintiff shall request a hearing on the issue of back pay." With respect to any compensatory damages available, the court "order[ed] the parties to attempt to resolve the amount ... available[.]" Finally, the court stated that "Plaintiff shall submit his request for attorney's fees along with supporting memoranda within thirty days."

On March 7, 1991, plaintiff filed a request for attorneys' fees and costs, with a supporting memorandum, pursuant to 29 U.S.C. § 794a(b).[1] Plaintiff seeks $129,904.20 in attorneys' fees and $1,376.21 in costs. The Postal Service responded to plaintiff's motion for attorneys' fees on April 10, 1991. On May 30, 1991, plaintiff filed a motion for award of out-of schedule pay. According to plaintiff, the parties have resolved all back pay issues except out-of-schedule pay. For the following rea-

sons, the court grants plaintiff $123,469.28 in attorneys' fees and $1,376.21 in costs. However, the court denies plaintiff's motion for out-of-schedule pay.

## I.

### Plaintiff's Request for Attorneys' Fees and Costs.

Plaintiff has two attorneys in this case, both of Laufman, Rauh, & Gerhardstein and both with considerable litigation experience: Robert Laufman and Alphonse Gerhardstein. Laufman seeks to bill his services at $160.00, as he is a senior partner, while Gerhardstein seeks to bill his service at $150.00, as he is also a partner. Laufman and Gerhardstein submit a total of 443.1 hours of services performed prior to the date the court's opinion was issued.[2]

Laufman and Gerhardstein request the court to enhance their fees to compensate for delay in payment. This enhancement, they suggest, can be implemented by allowing them to bill their current hourly rates, $160.00 and $150.00 respectively, for all services performed in this action regardless of when the services were provided. *See Missouri v. Jenkins by Agyei*, 491 U.S. 274, 109 S.Ct. 2463, 2469, 105 L.Ed.2d 229 (1989) (validating appropriate adjustment for delay in payment of civil rights attorney's fees by the application of current rather than historic hourly rates).

Plaintiffs' attorneys claim that they used billing judgment at the time the services were rendered and also eliminated 30.6 hours when figuring the total hours expended. Also, they suggest that their fees be reduced by no more than 10% for adjustment for lack of success. *See Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (discussing the reduction or increase of fees based on the overall degree of success of prevailing party).

---

1. 29 U.S.C. § 794a(b) provides:

 In any action or proceeding to enforce or charge a violation of a provision of this subchapter, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

2. This order only considers attorneys' fees requested for services performed prior to the court's February 6, 1991, opinion. After the entire matter has come to a close, which should be soon, plaintiff's attorneys may submit a second request for attorneys' fees along with supporting memoranda within thirty days of the date of the last activity in this case.

For the risk inherent in taking a civil rights contingency fee case, plaintiffs' attorneys seek a multiplier of 2. *See Pennsylvania v. Delaware Valley Citizens' Council*, 483 U.S. 711, 731, 107 S.Ct. 3078, 3089, 97 L.Ed.2d 585 (1987) (O'Connor, J., concurring) (validating compensation for risk contingency fee in appropriate circumstances).

*Defendant's Response.*

Defendant objects to plaintiffs' attorneys requested hourly rate, total reasonable hours billed, reduction for unsuccessful issues and multiplier. Defendant contends that plaintiffs' attorneys total hours serviced should be reduced because the complaints included several claims that were dismissed prior to trial. *See Hensley*, 461 U.S. at 434–36, 103 S.Ct. at 1939–41; *Wooldridge v. Marlene Industries*, 898 F.2d 1169, 1175 (6th Cir.1990) (no compensation for unsuccessful, separable claims). Defendant alleges that plaintiff's claims were not reduced to eight until May, 1989. Thus, time expended on the earlier meritless claims should not be allowed. Defendant requests the court to reduce the total hours sought by plaintiffs' attorneys 40%, due to the unsuccessful claims and the substantial reduction of the scope of the lawsuit over four years.

Defendant contends that a "small" number of work hours (four or five) for the claims that were either dismissed or withdrawn are identified in the time sheets for hours to be recovered. Defendant also complains that hours billed for "filing" or "delivering" pleadings cannot be reasonably billed under attorney rates, as these are clerical duties. *See Wooldridge*, 898 F.2d at 1176 n. 15 (even if clerical work was properly billable, it cannot be billed out at the billable rate of an attorney).

Defendant does not object to the use of current rates to calculate the lodestar, but does object to any additional compensation for delay in view of plaintiff's significant role in the delay of this matter. Defendant further objects to the request for full compensation of both Laufman and Gerhardstein for services during the trial. Finally, defendant challenges the proposed multiplier of 2.

## II.

Determining whether plaintiff prevailed in his suit is the threshold question to be answered before granting any attorneys' fees request. 29 U.S.C. § 794a(b); *Wooldridge*, 898 F.2d at 1173. The Postal Service does not, nor could it, argue that plaintiff is not a prevailing party. Plaintiff has succeeded on several significant issues in this litigation and has achieved most of the benefit sought in bringing this suit. *Texas State Teachers v. Garland Indep. School District*, 489 U.S. 782, 109 S.Ct. 1486, 1491, 103 L.Ed.2d 866 (1989); *Hensley*, 461 U.S. at 433, 103 S.Ct. at 1939. Plaintiff prevailed with respect to the General Expediter position and was awarded back pay and retroactive promotion concerning the PS–6 Training Technician position. He was awarded back pay in other respects and injunctive relief. *See James v. Frank*, No. C–1–85–1820 (S.D.Ohio February 6, 1991) page 987. Plaintiff H. Anthony James is therefore a prevailing party.

It is incumbent upon this court to provide a concise but clear explanation of its reasons for the fee award. *Wooldridge*, 898 F.2d at 1176. Upon review, the court finds that the requests of plaintiffs' attorneys are in most respects reasonable.

■ "The initial estimate of a reasonable attorney's fee is properly calculated by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate." *Blum v. Stenson*, 465 U.S. 886, 888, 104 S.Ct. 1541, 1543, 79 L.Ed.2d 891 (1984). The court finds plaintiff's attorneys request to bill at $160.00 and $150.00, respectively, to be quite reasonable.

■ Reasonable fees are to be calculated according to the prevailing market rates in the relevant community. *Id.* at 895, 104 S.Ct. at 1547. The relevant community in this instance is the Greater Cincinnati area. Since both counsel seeking fee awards practice here, we do not have the problem posed in *Maceira v. Pagan*, 698 F.2d 38, 40

(1st Cir.1983). In *Maceira* there were no local counsel with the requisite experience in the field to litigate the case, thus making it necessary for out-of-town counsel, with their higher rates, to be engaged. *See also Moore v. City of Des Moines*, 766 F.2d 343 (8th Cir.1985), *cert. denied*, 474 U.S. 1060, 106 S.Ct. 805, 88 L.Ed.2d 781 (1986); *Norman v. Housing Authority of Montgomery*, 836 F.2d 1292 (11th Cir.1988).

In 1983 Judge Carl Rubin, United States District Judge for the Southern District of Ohio, acting in his capacity as Chief Judge, impaneled an *ad hoc* committee to study the average hourly fees in the Cincinnati area. Unfortunately, this scientific survey has not been updated. According to the survey, Laufman qualifies as a "senior partner" and Gerhardstein qualifies as an "intermediate partner." The 1983 rate for senior partners was $128.34 and $113.43 for intermediate partners. Applying a 4% cost of living increase to these rates for the years 1984 through 1991, the adjusted hourly rates for 1991 would be $175.64 for senior partners and $155.24 for intermediate partners.

In December of 1990, *Ohio Law* published the rates billed by Cincinnati attorneys in the Federated Stores Bankruptcy case. The rates averaged as follows: nine attorneys with 20 years or more experience billed at $177.50; and twenty-two attorneys with 11 to 19 years experience billed at $160.34.

■ The affidavits of several Cincinnati area attorneys were submitted with plaintiff's request for attorneys' fees. These affidavits support as reasonable the requested rates of $160.00 and $150.00. *See, e.g.,* Affidavit of James B. Helmer, Jr. at 5 (Exhibit 17 to Plaintiff's Motion for Attorneys' Fees) (the hourly rates requested in this case are below the reasonable rate). One of the nation's premier civil rights litigators, Paul H. Tobias, of Tobias & Kraus, a Cincinnati firm, submits that in his professional opinion the rates requested by Laufman and Gerhardstein are "fair, reasonable and normal in view of the mar-

ket place and all the circumstances of the *James* case." *See* Affidavit of Paul H. Tobias at 2 (Exhibit 13 to Plaintiff's Motion for Attorneys' Fees).

Defendant objects to the requested rates on the ground that one of the attorneys that submitted an affidavit stated that the highest appropriate rate is $150.00. *See* Affidavit of Michael J. Mooney at 2 (Exhibit 15 to Plaintiff's Motion for Attorneys' Fees). Mr. Mooney's reference to a rate of $150.00 per hour was a general rate for counsel in civil rights litigation. Defendant contends that a fee of $150.00 for Laufman and $140.00 for Gerhardstein would be reasonable.

Robert F. Laufman was admitted to practice law in Ohio in 1961. Since 1972, most of his practice has been in federal civil rights and consumer law litigation. He has been the senior partner of his law firm since 1975. He has represented clients in excess of 200 federal civil rights and consumer law lawsuits. His hourly fee has been $160.00 since May of 1990. Alphonse A. Gerhardstein was admitted to practice in Ohio in 1976. For the past fourteen years, he has practiced primarily in the area of civil rights. Plaintiff received solid representation from Laufman and Gerhardstein and the requested rates are well within reason. Mooney's reference to $150.00 as the appropriate rate is not persuasive because the weight of the evidence reveals that the requested rates are reasonable and because the rates requested are in close proximity to the rate recommended by Mooney.

Having considered the requests of the plaintiffs' attorneys against the objections of the defendant, the court concludes that rates of $160.00 for Laufman and $150.00 for Gerhardstein are reasonable and appropriate. The weight of the evidence on the issue of a reasonable hourly rate clearly supports this conclusion. In fact, the 1983 survey of Cincinnati's average rates, updated by a mere 4% increase is above the rates requested.

The next consideration is the number of hours billed. Plaintiffs' attorneys seek

compensation for a total of 443.1 hours.[3] Defendant contends that this number should be drastically reduced because plaintiff's initial complaint of allegedly twenty claims was reduced to four prior to trial, because of plaintiff's lack of success on some claims, because requests are made for "filing" or "delivering" documents at attorney rates and because the request to fully compensate both Laufman and Gerhardstein during the trial is inappropriate.

First, it is true that plaintiff's complaint alleged some claims that were either dismissed or withdrawn prior to trial. The Sixth Circuit Court of Appeals, however, has noted that to review the reasonableness of the hours solely on whether they contributed to the ultimate success achieved is "an overly stringent standard." *Wooldridge*, 898 F.2d at 1177. The court stated that

> The question is not whether a party prevailed on a particular motion or whether in hindsight the time expenditure was strictly necessary to obtain the relief achieved. Rather, the standard is whether a reasonable attorney would have believed the work to be reasonably expended in pursuit of success at the point in time when the work was performed.

*Id.* at 1177.

A review of the record in this case, and my notes from the trial, reveal the difficulty of some of the factual and legal issues raised in this case. It is not unusual for a plaintiff to set forth several theories of recovery prior to sufficient discovery. It is also not unusual for the issues to be narrowed from the filing of the complaint to trial.

*James v. Frank* was easily a case where the plaintiff's claims for relief involved a common core of facts and related legal theories. *Hensley*, 461 U.S. at 435, 103 S.Ct. at 1940. This case cannot be viewed as a "series of discrete claims." *Id.* Thus, this court "should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Id.* Applying *Wooldridge* and *Hensley* to this case, the court concludes that the hours sought by plaintiff's counsel are in most respects reasonable, even given the narrowing of the issues prior to trial and the unsuccessful issues at trial.

However, the court also concludes that some reductions are in order. First, the 2.1 hours billed at attorney rates for filing or delivering is inappropriate and will not be allowed. *Wooldridge*, 898 F.2d at 1176 n. 15.[4] Second, plaintiffs' attorneys suggest that the court decrease their lodestar by 10% due to unsuccessful claims. Defendants sought a reduction of 40%. Although the court found that plaintiff's claims were substantially related, given the number of the withdrawn and dismissed claims and other factors, the court finds that the lodestar[5] should be reduced by 12%. *See Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3rd Cir.1990) (court can adjust lodestar downward if the lodestar is not reasonable).

Finally, defendant objects to the total hours requested by plaintiff's attorneys because Gerhardstein did not fully participate in the trial. Defendant contends that Gerhardstein's participation in the trial was limited to the cross-examination of one of the Postal Service's witnesses.

Gerhardstein has not participated in this litigation since its start. He only attended the final pre-trial conference and the five days of trial. Therefore, he has only billed 40.7 hours in this case. The 40.7 hours billed by Gerhardstein represent the final pre-trial conference, preparation for trial, a conference regarding the trial and the actual trial itself. The court finds these hours to be reasonable.

It is not unusual for a law firm to use two attorneys at trial. As noted above,

---

**3.** Of the total hours requested, Laufman billed 402.4, and Gerhardstein billed 40.7.

**4.** Plaintiff's attorneys may wish to submit an appropriate rate for these hours in their final motion for fees.

**5.** The lodestar is the product of reasonable hours times a reasonable rate.

this was a complicated trial and this court will not call into question the use of two attorneys during the trial. *See Norman v. Housing Authority of Montgomery*, 836 F.2d 1292, 1302 (11th Cir.1988) ("There is nothing inherently unreasonable about a client having multiple attorneys, and they may all be compensated if they are not unreasonably doing the same work and are being compensated for the distinct contribution of each lawyer."). The court notes here that the Postal Service used two attorneys at every deposition, every meeting, every pre-trial conference and during each of the five days of trial. Also, contrary to the defendant's claim, Gerhardstein examined two witnesses at trial. Furthermore, the court notes that he was in frequent consultation with Laufman in the courtroom and participated in interviewing witnesses examined by Laufman.

Having reviewed carefully the hours submitted by Laufman and Gerhardstein, the court finds them, except as adjusted above, to be reasonable and appropriate. *See* Exhibits 4 and 9 of Plaintiff's Motion for Attorneys' Fees. The hours billed are all related to this case and were reasonably necessary in order to effectively litigate this matter.

### III.

The Postal Service's last objection regarding the motion for attorneys' fees concerns plaintiff's request for a contingent risk adjustment, due to the risk involved in a civil rights case taken on a contingent fee basis. The contingent risk adjustment is used to adjust the lodestar upward. The amount of the upward adjustment is determined by the multiplier used. Here, plaintiff's attorneys request a multiplier of two.

The Supreme Court addressed the issue of a contingent risk upward adjustment in *Pennsylvania v. Delaware Valley Citizens' Council*, 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987). A review of *Delaware Valley* indicates that a contingent risk adjustment is appropriate in some cases.

*Delaware Valley* consists of three opinions. In his plurality opinion, Justice White, was joined by Chief Justice Rehnquist, Justice Powell and Justice Scalia. The plurality held that multipliers or other enhancements of a reasonable loadstar fee to compensate for assuming the risk of loss is impermissible. *Id.* at 727, 107 S.Ct. at 3087. In his dissenting opinion, Justice Blackman was joined by Justice Brennan, Justice Marshall and Justice Stevens. The dissenters opined that upward adjustment for a case taken on a contingent basis is appropriate in most circumstances. Thus, Justice O'Connor's concurring opinion constitutes the Court's holding in the case. *See, e.g., Fadhl v. City and County of San Francisco*, 859 F.2d 649, 650 n. 1 (9th Cir. 1988); *Weisberg v. U.S. Dept. of Justice*, 848 F.2d 1265, 1272 (D.C.Cir.1988).

Under *Delaware Valley*, an upward adjustment for the risk of a contingency case may be appropriate if the fee applicant establishes that "without an adjustment for risk the prevailing party 'would have faced substantial difficulties in finding counsel in the local ... market' " and any enhancement reflects "the difference in market treatment of contingent fee cases *as a class*, rather than ... the 'riskiness' of any particular case." 483 U.S. at 731, 733, 107 S.Ct. at 3089, 3090 (O'Connor, J., concurring) (emphasis in original). The court finds that the prerequisites established by the Court in *Delaware Valley* for determining if an upward adjustment for the risk of contingency is appropriate have been met.

The court finds that plaintiff's attorneys have established that without an adjustment for risk the prevailing party would have faced substantial difficulties in finding counsel in the local market and that any enhancement in this case will reflect the difference in market treatment of contingent cases as a class rather than the assessment of the riskiness of James' case.

Former United States Magistrate for the Southern District of Ohio from 1976 to 1988, J. Vincent Aug, Jr., was responsible for locating attorneys to represent individuals in employment discrimination cases. Judge Aug testified that during most of this time there were only seven to ten

attorneys who would agree to investigate a complaint with the possibility of representing the individual on a contingency basis. Two of these were Robert F. Laufman and Alphonse A. Gerhardstein. *See* Affidavit of Judge J. Vincent Aug, Jr. at 2 (Exhibit 20 to Plaintiff's Motion for Attorneys' Fees).

Judge Aug also stated that around 1985 he attempted to encourage some of Cincinnati's larger law firms to accept discrimination cases as part of their pro bono work. This approach, however, "met with limited success and the attempt was abandoned." *Id.* Judge Aug further stated that the primary reason that his attempts to obtain counsel in employment discrimination cases met with "very limited success" was "the risk the attorney took of not being compensated for his services." *Id.* Finally, Judge Aug opined that "in 1985, any plaintiff would have faced substantial difficulties in finding counsel in the Cincinnati area without an upward adjustment for risk." *Id.* at 3.

Unfortunately, the trend testified to by Judge Aug remains the case today. Mary Asbury, Executive Vice President of the Volunteer Lawyers for the Poor Foundation ("VLPF") and the Executive Director of the Legal Aid Society of Cincinnati, testified that during 1989 and 1990, the VLPF attempted to refer thirty-two employment discrimination cases to private attorneys for representation on a contingent fee basis. The VLPF was successful on only three cases. Asbury further testified that to her knowledge fewer than ten private attorneys in the Cincinnati area will accept employment discrimination on a contingent fee basis. Asbury concluded that potential plaintiffs in employment discrimination cases "face real difficulty in obtaining counsel in the Cincinnati area." *See* Affidavit of Mary Asbury (Exhibit 16 to Plaintiff's Motion for Attorneys' Fees).

The few Cincinnati attorneys inclined to accept employment discrimination cases on a contingent basis are increasingly refusing to handle these cases because of the inherent risk of non-payment. *See* Affidavit of Michael J. Mooney; Affidavit of Lee

Hornberger at 3 (Exhibit 14 to Plaintiff's Motion for Attorneys' Fees); Affidavit of James B. Helmer, Jr. at 6; Affidavit of Michael J. Boylan at 2 (Exhibit 18). The affiants of record in this case testified that competent counsel in the Cincinnati area will not undertake contingency fee cases in complex federal litigation unless the expectation of an enhancement is present.

■ To establish that James would have encountered substantial difficulties in obtaining counsel, "applicants are not required to show that plaintiff[ ] actually did face difficulty." *McKenzie v. Kennickell,* 875 F.2d 330, 334–35, 337 (D.C.Cir.1989). Plaintiff's complaint was filed in 1985. Based primarily on the affidavit of Judge Aug, who was responsible for locating attorneys to represent individuals in employment discrimination cases during the time plaintiff filed his complaint, the court finds that the first prong of *Delaware Valley* has been established. *See McKenzie,* 875 F.2d at 334–35, 337 (focus on time the case was commenced not on time the fee is awarded). In Cincinnati, there exists a severe shortage of attorneys willing to accept contingency cases in the absence of an enhancement. Moreover, the court concludes that the evidence above helps to establish that any enhancement in this case will reflect the difference in market treatment of contingent cases as a class rather than the assessment of the riskiness of James' case.

The relevant legal market, the Cincinnati area, adds a premium for contingency. Five affidavits of Cincinnati area attorneys submitted by plaintiff's attorneys, including that of Paul H. Tobias, state that a multiplier of at least two is appropriate in contingency cases. These affiants testified that their firms will not undertake contingency fee litigation without the expectation of an enhancement. The Postal Service has submitted no contrary evidence. The court finds that the legal market in the Cincinnati area required compensation for contingency in 1985. Thus, the second prong of *Delaware Valley* is also met.

The Sixth Circuit Court of Appeals has approved of multipliers in other areas. *See*

*Perotti v. Seiter*, 935 F.2d 761 (6th Cir. 1991) (proper for district court to consider 2.0 multiplier in § 1983 prisoner litigation); *Fite v. First Tennessee Prod. Credit Ass'n.*, 861 F.2d 884 (6th Cir.1988) (affirming multiplier of 1.75 in age discrimination case for contingent nature of the case). *See also King v. Palmer*, 906 F.2d 762, 767 (D.C.Cir.1990) (reversing grant of 1.5 multiplier and awarding 2.0 multiplier in contingency Title VII case); *Rode v. Dellarciprete*, 892 F.2d 1177, 1184 (3rd Cir.1990) (contingency multiplier is appropriate in some cases); *Fadhl v. City of San Francisco*, 859 F.2d 649, 650 (9th Cir.1988) (affirming multiplier of 2 in Title VII contingency case). After carefully reviewing the record and the evidence submitted in this motion, the court finds that a multiplier of 2.0 is appropriate.

Plaintiffs' attorneys seek $129,904.20 in attorneys' fees and $1,376.21 in costs. The above adjustments by the court reduce the amount to $123,469.28.[6] The costs sought by plaintiffs' attorneys are reasonable in all respects. Therefore, it is ordered that plaintiffs' attorneys are awarded $123,-469.28 in attorneys' fees and $1,376.21 in costs.

### IV.

 Plaintiff has also moved the court for an award of out-of-schedule pay. After careful consideration, this motion is denied. The relevant Postal Regulations provide for the payment of out-of-schedule pay as follows:

> 'Out of schedule premium' is paid to eligible full-time bargaining-unit employees for time worked outside of, and instead of, their *regularly* scheduled workday or workweek when employees work on a *temporary* schedule at the request of management.

Employee and Labor Relations Manual ("ELM"), Section 434.611 (emphasis added)

(Exhibit 113 attached to Plaintiff's Motion for Out-of-Schedule Pay). As the language of this regulation suggests, out-of-schedule pay is to be paid when one's normal schedule is temporarily disrupted for the convenience of management. This is not the situation which James faced. Had James been promoted, he would not have received this premium. Thus, paying James a premium for the hours he worked outside the schedule he would have had had he been promoted is to give him more than he would have received had he actually received the job. In the context of Title VII, this court has held that damages, including back pay, are intended to make persons whole for past discrimination by restoring the economic position they would have occupied absent discrimination. *See Shore v. Federal Express Corp.*, 777 F.2d 1155, 1158–59 (6th Cir.1985). We see no reason why the same principle should not apply in this case. Accordingly, the motion for out-of-schedule pay is denied.[7]

It is so ordered.

---

**6.** The court reached this figure by first multiplying the number of reasonable hours, 400.3 for Laufman and 40.7 for Gerhardstein, times their reasonable rates, $160.00 and $150.00 respectively. The products, $64,048.00 and $6,105.00, were then added together and reduced by 12%, yielding $61,734.64. This figure was then multiplied by two, yielding $123,469.28.

**7.** This holding is not meant, however, to preclude James from receiving back pay for the eight hours per day he would have received had he been promoted less any mitigation.